IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

WATSON CARPET & FLOOR COVERING, INC.,          )
                                                )
          Plaintiff,                            )
                                                )
v.                                              )          Civil Action No. 3:09-cv-487
                                                )
MOHAWK INDUSTRIES, INC., CARPET DEN,            )          Judge Thomas A. Wiseman, Jr.
INC., and RICK McCORMICK,                       )
                                                )
          Defendants.                           )

## MEMORANDUM OPINION #1

Plaintiff Watson Carpet and Floor Covering, Inc. ("Watson") filed this action against defendants Mohawk Industries, Inc. ("Mohawk"), Rick McCormick, and Carpet Den, Inc. ("Carpet Den") (collectively, "Defendants"), pursuant to the Clayton Act, 15 U.S.C. § 15, to recover for alleged injuries to its business resulting from the defendants' purported violation of section 1 of the Sherman Act, 15 U.S.C. § 1. Now before the Court is Mohawk's Motion to Dismiss (Doc. No. 14) under Rule 12(b)(6) of the Federal Rules of Civil Procedure on the grounds that Watson's claims against Mohawk are barred by the applicable statute of limitations. Alternatively, Mohawk argues that the allegations in the Complaint are insufficiently concrete to support a § 1 Sherman Act claim under the standard established by the Supreme Court in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555, 557 (2007).

For the reasons set forth herein, the Court finds that the plaintiff's claims against Mohawk are not barred by the statute of limitations but that, under *Twombly*, the complaint fails to allege "enough facts to state a claim to relief that is plausible on its face." *Id.* at 570. The motion to dismiss will therefore be granted.

## I.     STANDARD OF REVIEW

When ruling on a defendant's motion to dismiss, this Court must "construe the complaint liberally in the Plaintiffs' favor and accept as true all factual allegations and permissible inferences therein." *Gazette v. City of Pontiac*, 41 F.3d 1061, 1064 (6th Cir. 1994). The Court, however, is "not bound to accept as true a legal conclusion couched as a factual allegation." *Papasan v. Allain*, 478 U.S. 256, 286 (1986). Thus, a complaint that merely consists of "a formulaic recitation of the elements of a cause of

action" or a "naked assertion" lacking "some further factual enhancement" can be dismissed at the pleading stage. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555, 557 (2007). To withstand a Rule 12(b)(6) motion under the recently established *Twombly* standard, a complaint must allege "enough facts to state a claim to relief that is plausible on its face." *Id.* at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (citing *Twombly*, 550 U.S. at 446). Thus, "even though a complaint need not contain 'detailed' factual allegations, its 'factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true.' " *Ass'n of Cleveland Fire Fighters v. City of Cleveland*, 502 F.3d 545, 548 (6th Cir. 2007) (quoting *Twombly*, 550 U.S. at 555).

*Twombly*'s more rigorous "plausibility" standard supplants the earlier standard established by *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957), which held that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." The most significant difference between the two pleading standards is that *Twombly* allows for the Rule 12(b)(6) dismissal of "a wholly conclusory statement of claim . . . whenever the pleadings [leave] open the possibility that a plaintiff might later establish some 'set of [undisclosed] facts' to support recovery." *Twombly*, 550 U.S. at 561 (alterations in original) (quoting *Conley*, 355 U.S. at 45). In short, "[t]he plaintiff must assert facts that affirmatively and plausibly suggest that the pleader has the right he claims . . . rather than facts that are merely consistent with such a right." *Stalley ex rel. U.S. v. Catholic Health Initiatives*, 509 F.3d 517, 521 (8th Cir. 2007) (citing *Twombly*, 550 U.S. at 557).

**II.     FACTUAL BACKGROUND**

Based upon the applicable standard of review pertaining to Mohawk's Motion, the Court presumes the following facts to be true:

Plaintiff Watson is an independent dealer of carpet and other floor coverings in the Nashville area (*i.e.*, in Davidson, Williamson, Rutherford, Wilson and Sumner Counties). It sells carpet and other floor coverings to homebuilders and retail customers, and installs these floor coverings in its customers' homes. The vast majority of Watson's revenues come from sales to homebuilder customers.

Defendant Carpet Den is similarly an independent dealer of carpet and other floor coverings in the Nashville area and is Watson's direct competitor. Both Watson and Carpet Den purchase carpet from carpet manufacturers including defendant Mohawk. Mohawk and one other manufacturer, Shaw Industries ("Shaw"), together supply the vast majority of carpet installed by homebuilders in the Nashville area, with Shaw controlling approximately 45% and Mohawk controlling approximately 50% of the market share for new home installations.

Pursuant to industry practice, "production homebuilders," defined by Plaintiff as homebuilders that build at least one hundred houses per year in the relevant geographic market, purchase the carpet to be used in the houses they build from an independent dealer, who actually installs the carpet and provides various follow-up services. Carpet Den and Watson are two of three main independent carpet dealers in the Nashville area and, of the three, Carpet Den controls the most market share. The dealers are not exclusive dealers; generally speaking, they all sell and install carpet manufactured by Mohawk, Shaw and other manufacturers. Production homebuilders, however, may change brands between Mohawk, Shaw, and their competitors from time to time, and may enter into exclusive dealing agreements in which they agree to purchase exclusively that manufacturer's carpet for use in the homes they build during a certain period of time.

In 1998, defendant Rick McCormick, president and sole shareholder of Carpet Den, met with Mohawk's Vice President and Senior Manager, Brad Matthaidess, and Mohawk sales representative Fred Woods, and devised a plan to run Watson out of business and eliminate Watson from the market. As part of that plan, Mohawk would refuse to sell certain types of carpet to Plaintiff. Defendant McCormick, Matthaidess and Woods specifically discussed their intention to run Plaintiff out of business by shutting off its supply of Mohawk carpet. Other management employees at Mohawk approved of this plan. Defendant McCormick was instrumental in devising and implementing the scheme to run Plaintiff out of business. As part of the scheme, McCormick and other agents of Carpet Den would make false and derogatory accusations about Watson and its principal, Johnny Watson, to Watson's actual and potential customers in the industry with the intent to discourage customers and potential customers from doing business with Watson. As part of the plan to put Watson out of business, Fred Woods would likewise

make false and derogatory accusations about Watson to others in the homebuilding and flooring industry for the purpose of discouraging customers and potential customers from doing business with Plaintiff.

In its current complaint, Watson also alleges that, in furtherance of the conspiracy to put Watson out of business, Fred Woods made accusations to others in the industry that Johnny Watson used drugs, cheated his customers, had financial problems, had problems with the IRS, and had affairs with his employees. Defendant McCormick, in furtherance of the conspiracy, allegedly held a sales meeting instructing his sales people that, if they were competing for a job with Watson, they should "lowball" the price and go as low as necessary to keep Watson from getting the job, even if it meant losing money on the sale.

The complaint does not indicate when those events transpired, but it appears that they are alleged to have occurred in or around 1999, as the complaint makes the above-referenced allegations in the same context as allegations about other events that allegedly took place in 1999. Among those is the assertion that in early 1999 McCormick, in furtherance of the conspiracy, approached the president of Turnberry Homes with false and malicious accusations that Watson had been wrongfully pocketing rebates from Shaw that should have gone to Turnberry Homes. The president of Turnberry Homes did not actually believe the accusations, and the effort to turn Turnberry Homes away from Watson was ultimately unsuccessful. However, also in 1999, Mohawk refused to sell its "Portico" line of carpet to Watson for purposes of servicing another customer, Centex, which had entered into an agreement with Mohawk to use that particular type of carpet in its new homes. Centex wanted to be able to purchase the carpet through Watson, but as a result of Mohawk's refusal to sell the carpet to Watson, Watson lost Centex's business.[1]

Allegations regarding these events that took place in 1998 and 1999 appear to merely set the backdrop for more recent actions allegedly taken by Mohawk in furtherance of the same conspiracy formed in 1998. In a separate portion of the Complaint, Watson sets forth three "Counts" alleging violations of the Sherman Act, for which recovery of damages is provided under the Clayton Act. The factual allegations supporting the three separate Counts concern actions undertaken solely by Mohawk in 2005, 2006 and 2007. Specifically, Watson alleges that in May 2005, Mohawk, "[p]ursuant to and in

---

[1] Watson's loss of the Centex business was the subject of a lawsuit it filed against the same defendants in 1999, as discussed below.

furtherance of the conspiracy" purportedly formed in 1998 (Compl. ¶ 32), refused to sell to Watson the particular carpet type it needed to service its customer Newmark Homes, thereby causing Watson to lose that customer's business and the profits that would have accompanied that business. (Compl. ¶¶ 31–37 ("Count 1").) In 2006, Watson's customer, Pulte Homes, entered into an agreement with Mohawk pursuant to which Pulte agreed to use Mohawk Portico carpet exclusively in new homes built in the Nashville area. However, according to Watson, "pursuant to and in furtherance of the [1998] conspiracy, Mohawk refused to sell Plaintiff the Portico carpet required by Pulte Homes" (Compl. ¶ 40), thereby causing Watson to lose its relationship with Pulte and the attendant profits it would have obtained through that relationship. (Compl. ¶¶ 39–45 ("Count 2").) Finally, in May 2007, Watson attempted to order carpet from Mohawk in order to service its customer, Wieland Homes. Wieland Homes also contacted Mohawk to request that Mohawk sell the carpet it needed through Watson. Mohawk, allegedly in furtherance of the 1998 conspiracy, refused to sell Watson the carpet required by Wieland Homes in its new home construction projects in the Nashville area, thereby causing Watson to lose that business and the anticipated profits therefrom. (Compl. ¶¶ 47–54 ("Count 3").)

While accepting as true the factual assertions in the Complaint for purposes of its Motion to Dismiss, Mohawk also introduces additional facts in the form of judicial filings made in the course of a Williamson County Circuit Court case between the same parties to the present suit, including Watson's 1999 complaint against Mohawk, Carpet Den and McCormick making factually similar allegations to those made here, including that Mohawk and McCormick had entered into a conspiracy in 1998 for the purpose of harming Watson's business relationships, in which they agreed that Mohawk would not sell certain private label carpet to Watson, and that Mohawk acted in furtherance of that conspiracy when it refused to sell Portico carpet to Watson to supply to Centex. A lengthy jury trial resulted in a judgment against all three defendants and a damages award in favor of Watson for more than $5,000,000, including punitive damages. In 2007, the Tennessee Court of Appeals reversed the judgment against Mohawk on the grounds that "Mohawk cannot be held liable simply for declining to sell specific carpet to Watson. [Mohawk's] decisions on what companies to deal with and what to sell them are privileged. Consequently, the judgment against Mohawk for interference with Watson's relationship with [homebuilder] Centex is reversed." *Watson's Carpet & Floor Coverings, Inc. v. McCormick*, 247 S.W.3d

169, 179 (Tenn. Ct. App. 2007) (Doc. No. 17-2). The Tennessee Court of Appeals likewise reversed in part the judgment as to defendants McCormick and Carpet Den on the basis that these defendants could not conspire to do something with Mohawk that Mohawk was privileged to do. *Id.* at 186. The court, however, affirmed the judgment against McCormick and Carpet Den for tortious interference with Watson's business relationship with Mohawk. *Id.*

## III.    ANALYSIS AND DISCUSSION

### A.    The Court May Consider the Williamson County Circuit Court Filings without Converting Mohawk's Motion into a Summary Judgment Motion.

Generally speaking, court filings are public records that the Court may consider without converting a motion to dismiss into a motion for summary judgment. *Kostrzewa v. City of Troy*, 247 F.3d 633, 644 (6th Cir. 2001); *cf. Signature Combs, Inc. v. United States*, 253 F.Supp.2d 1028, 1041 n.5 (W.D. Tenn. 2003) (noting that a bankruptcy order was a "public record" of which the court could take judicial notice without converting a motion to dismiss into one for summary judgment). Accordingly, the Court agrees with Mohawk that it may consider the court filings and orders entered by the Tennessee state courts in the Williamson County Circuit Court case in which these same parties were previously involved without converting the present motion into one for summary judgment. To be clear, however, the Court will take notice of the *existence* of the filings in the prior proceedings and the statements of fact recited therein without necessarily taking notice of the truth of those statements. *Cf.* Fed. R. Evid. 201(b) ("A judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."); *Lee v. County of Los Angeles*, 240 F.3d 754, 775 (9th Cir. 2001) (taking notice of the existence of another court's opinion and statements of facts recited in the opinion, but not of the truth of those statements).

### B.    Application of the Statute of Limitations

Plaintiff brings claims under the authority of the Clayton Act, specifically 15 U.S.C. § 15, based upon alleged violations of the Sherman Act, 15 U.S.C. § 1, *et seq.* Claims under § 15 are subject to a four-year limitations period. 15 U.S.C. § 15b ("Any action to enforce any cause of action under section 15. . . of this title shall be forever barred unless commenced within four years after the cause of action accrued."). In applying this statute, the Supreme Court has espoused a general rule to the effect that an

antitrust "cause of action accrues and the statute begins to run when a defendant commits an act that injures a plaintiff's business." *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 338 (1971). One exception to this general rule, the "continuing violation exception," is that, "[i]n the context of a continuing conspiracy to violate the antitrust laws, . . . each time a plaintiff is injured by an act of the defendants a cause of action accrues to him to recover the damages caused by that act and that, as to those damages, the statute of limitations runs from the commission of the act." *Zenith Radio*, 401 U.S. at 338. Another exception recognized in *Zenith Radio*, the "speculative damages exception," is that if future damages are unascertainable and therefore unrecoverable at the time a cause of action would otherwise be deemed to accrue, a cause of action for such damages does not actually accrue until the plaintiff suffers the damages. *Id.* at 339.

The Sixth Circuit has described the "continuing violation" exception to the general four-year statute of limitations as follows:

> A continuing antitrust violation is one in which the plaintiff's interests are repeatedly invaded. When a continuing antitrust violation is alleged, a cause of action accrues each time the plaintiff is injured by an act of the defendants. Even when a plaintiff alleges a continuing violation, an overt act by the defendant is required to restart the statute of limitations and the statute runs from the last overt act. . . .
>
> . . . .
>
> An overt act that restarts the statute of limitations is characterized by two elements: (1) it must be a new and independent act that is not merely a reaffirmation of a previous act; and (2) it must inflict new and accumulating injury on the plaintiff.

*DXS, Inc. v. Siemens Med. Sys., Inc.*, 100 F.3d 462, 467 (6th Cir. 1996) (internal citations and quotation marks omitted). In other words, even under the "continuing violation" exception, "for statute of limitations purposes, the focus is on the timing of the causes of injury, *i.e.*, the defendant's overt acts, as opposed to the effects of the overt acts." *Id.*

In the case at bar, Mohawk argues that Watson's claims are barred by the four-year statute of limitations because, assuming the plaintiff's allegations to be true, the conduct in which Mohawk engaged is nothing more than a manifestation of the conspiracy allegedly entered into in 1998. Watson, on the other hand, asserts that the new refusals to deal that occurred in 2005, 2006 and 2007 are evidence of a "continuing violation" sufficient to restart the running of the statute of limitations and that they fall within the "speculative damages" exception announced in *Zenith Radio*.

In support of its position, Watson relies primarily on the reasoning of *Poster Exchange, Inc. v. National Screen Service Corp.*, 517 F.2d 117 (5th Cir. 1975), *cert. denied*, 423 U.S. 1054 (1976), in which the Fifth Circuit was confronted with an alleged conspiracy among the defendants to refuse to deal with the plaintiffs. Although the defendants had stopped dealing with the plaintiffs in 1961, suit was not filed until 1969, well over four years after the formation of the alleged conspiracy. The district court granted summary judgment for the defendants on limitations grounds. The Fifth Circuit, however, reversed and remanded, holding that the plaintiff could maintain the action if it could show that "there had been a specific act or word of refusal during the limitations period." *Id.* at 129. To reach that holding, the *Poster Exchange* court distinguished between the mere absence of dealing and an actual refusal to deal: "It remains clear . . . that a newly accruing claim for damages must be based on some injurious act actually occurring during the limitations period, *not merely the abatable but unabated inertial consequences of some pre-limitations action.*" *Id.* at 128 (emphasis added).

In *Peck v. General Motors*, 894 F.2d 844 (6th Cir. 1990), a case upon which Mohawk relies here, the Sixth Circuit rejected the plaintiffs' theory of a continuing violation because the events upon which the plaintiffs' complaint was predicated were not actions by the defendants but the long-term results of such acts. These events, including the loss of their jobs and the capacity to sell life insurance, and the date that one of the plaintiffs was deprived of his franchise, were nothing more than "the rippling effect into the future" of past acts by the defendants. 894 F.2d at 849. The plaintiffs, unfortunately, did not point to any overt acts by the defendants within the limitations period that gave rise to the alleged harms. And, while the events of which the plaintiffs complained "unquestionably occurred within the four-year limitation period," they were not acts *by the defendants* that "caused the plaintiffs damage." *Id.* (citation omitted). As the court noted, the date on which the defendants acted was determinative for statute of limitations purposes, not the date on which the plaintiff felt the effects of those acts:

> Because the statute [of limitations] runs from the last overt act[,] . . . the timing of the plaintiffs' loss of employment is irrelevant insofar as the statute of limitations is concerned. The complaint includes no specific allegation of any overt act committed on or after June 20, 1984; the complaint simply refers to acts "[b]eginning in the late 1970's or early 1980," and "policies enacted during the entire period of the 1980's[.]" Moreover, the plaintiffs have steadfastly adhered to their contention that their injuries occurred within the limitations period, but have made no serious contention that the overt acts causing their injuries occurred after June 20, 1984. Because *the timing of the defendants' overt acts, not the timing of the plaintiffs' injuries, controls the statute of limitations issue*, the plaintiffs' antitrust claims are time-barred.

*Id.* (emphasis added; internal quotation marks and citations omitted).

Relying on the same principles, the Sixth Circuit reversed summary judgment for the defendant on plaintiff's antitrust claims on statute of limitations grounds in the case of *DXS, Inc. v. Siemens Medical Systems, Inc.*, 100 F.3d 462 (6th Cir. 1996). There, the defendant attempted to characterize the plaintiff's claim as based upon a notification of changes in the defendant's policies issued more than four years before the plaintiff filed suit. However, the plaintiff also alleged that the defendant had communicated misstatements, within the limitations period, to certain of plaintiff's customers regarding plaintiff's warranty policies. The district court had found that the notification was the defendant's only overt act, and that the plaintiff subsequently felt the effects of that act. The Sixth Circuit disagreed, and found that each of the subsequent statements to the plaintiff's customers constituted overt acts giving rise to a continuing antitrust violation. *Id.* at 467.

By contrast, in *Grand Rapids Plastics, Inc. v. Lakian*, 188 F.3d 401 (6th Cir. 1999), the Sixth Circuit found that commission payments allegedly made by one defendant to another in furtherance of a prior illegal agreement did not constitute independent wrongful acts that restarted the running of the statute of limitations. Rather, "the individual payments . . . were only a manifestation of the previous agreement," which was made more than four years prior to the filing of the plaintiff's lawsuit, and therefore did not "constitute a 'new and independent act' as required to restart the statute of limitations." *Id.* at 406 (quoting *DXS*, 100 F.3d at 467). The court therefore affirmed the district court's dismissal of the antitrust claims based on those payments as barred by the statute of limitations.

Based on the distinctions drawn in the above-referenced cases, this Court is inclined to find that Mohawk's affirmative refusals, in 2005, 2006 and 2007, to sell specific products to Watson that would have allowed it to service three different customers constituted "new and independent act[s]," *DXS*, 100 F.3d at 467, and that each refusal to deal inflicted "new and accumulating injury on the plaintiff," *DXS*, 100 F.3d at 467, which was not merely "the abatable but unabated inertial consequences of some pre-limitations action," *Poster Exchange*, 517 F.2d at 128. This is not a situation in which Mohawk is alleged simply to have continued to abide by an earlier refusal to deal or a situation; rather, Watson alleges that it made specific requests to purchase carpet in order to service the requirements of three specific customers, and Mohawk acted overtly, within the limitations period, by refusing those requests. It

therefore appears that this case, for purposes of applying the statute of limitations, would fall within the continuing-violation exception.

Moreover, the allegations clearly fall within the other exception articulated in *Zenith Radio*, the "speculative damages" exception. 401 U.S. at 338. In addressing this exception, the Supreme Court noted that the limitations period has generally been understood, in the "continuing conspiracy" context, "to mean that each time a plaintiff is injured by an act of the defendants a cause of action accrues to him to recover the damages caused by that act and that, as to those damages, the statute of limitations runs from the commission of the act." *Id.* at 338–39. However, because future damages are recoverable under the statute, once a plaintiff "feels the adverse impact of an antitrust conspiracy on a particular date, a cause of action immediately accrues to him to recover all damages incurred by that date and all provable damages that will flow in the future from the acts of the conspirators on that date." *Id.* at 339. Thus, to recover those damages, the plaintiff must sue within four years from the accrual of that action. "On the other hand, it is hornbook law, in antitrust actions as in others, that even if injury and a cause of action have accrued as of a certain date, future damages that might arise from the conduct sued on are unrecoverable if the fact of their accrual is speculative or their amount and nature unprovable." *Id.* (citations omitted). The Court continued:

> In antitrust and treble-damage actions, refusal to award future profits as too speculative is equivalent to holding that no cause of action has yet accrued for any but those damages already suffered. In these instances, the cause of action for future damages, if they ever occur, will accrue only on the date they are suffered; thereafter the plaintiff may sue to recover them at any time within four years from the date they were inflicted. Otherwise future damages that could not be proved within four years of the conduct from which they flowed would be forever incapable of recovery, contrary to the congressional purpose that private actions serve as a bulwark of antitrust enforcement, and that the antitrust laws fully protect the victims of the forbidden practices as well as the public.

*Id.* (internal quotation marks and citations omitted).

In other words, as applied to this case, even if, in theory, Mohawk's refusal in 2005, 2006 and 2007 to sell Portico and other carpet models to Watson was simply a new manifestation or a continued effect of the 1998 agreement, the fact remains that the new refusals to deal led to the loss of relationships with three different specific customers that were not necessarily foreseeable in 1998. Because there is at least a question of fact as to whether the damage alleged now would have been too speculative to

recover before these concrete refusals to deal occurred, the Court finds that dismissal on statute of limitations grounds is not warranted.[2]

###### C. The Adequacy of the Conspiracy Pleading

In the alternative, however, Mohawk argues that the allegations in the complaint are too conclusory to support a claim for conspiracy, particularly because the only defendant that is alleged to have engaged in any action within the limitations period is Mohawk, and Mohawk was incapable of conspiring with itself alone. *See Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 761 (1984) ("Independent action is not proscribed. A manufacturer of course generally has a right to deal, or refuse to deal, with whomever it likes, as long as it does so independently.") Mohawk further points out that there are no allegations that a reaffirmation of the alleged conspiracy between the various co-conspirators occurred at any time after 1999, and argues that "the allegations claiming new harm in 2005, 2006 and 2007 cannot rise above a speculative level because they are entirely unsupported by any factual link to the 1998 conspiracy." (Doc. No. 28, at 2.) Rather, given the absence of any such allegations, Mohawk insists that it is just as reasonable to infer that the reason for its refusal to deal with Watson is the fact that it has been hotly engaged in litigation with Watson for the better part of the past eight years.

The Court agrees. The plaintiff's claims here are premised upon Section 1 of the Sherman Act, which requires evidence of a conspiracy between multiple parties. Watson does not allege the existence of any meetings between the parties or any overt acts giving rise to an inference that the parties reaffirmed the conspiracy at any time after 1998. The bare facts that the Court must accept as true are that a conspiracy was formed in 1998, that the parties here were engaged in contentious litigation concerning that conspiracy from 1999 through 2007, and that Mohawk refused to deal with Watson on three separate instances in 2005, 2006 and 2007. Although Watson alleges in its Complaint that Mohawk's refusal to deal was "pursuant to and in furtherance of" the 1998 conspiracy, it does not point to any actual facts that support that conclusory assertion, and the Court is not required to accept it as true. *Twombly*, 550 U.S. at 561. As Mohawk points out, the fact that the parties were engaged in litigation throughout the relevant time frame constitutes an eminently plausible reason for the refusal to deal. *Cf. Zoslaw v. MCA Distrib. Corp.*, 693 F.2d 870, 889–90 (9th Cir. 1982) (holding that a manufacturer's refusal

---

[2] Mohawk concedes that the business opportunities Watson now claims it has been denied did not even exist in 1998 or 1999 when the defendants formed the alleged conspiracy.

to deal with a customer who had brought suit against it could not, without more, give rise to an unreasonable restraint of trade, since "the relationship between a manufacturer and his customer should be reasonably harmonious; and the bringing of a lawsuit by the customer may provide a sound business reason for the manufacturer to terminate their relation" (quoting *House of Materials, Inc. v. Simplicity Pattern Co.*, 298 F.2d 867, 871 (2d Cir. 1962)).  Under *Twombly*, proof of a conspiracy "must include evidence tending to exclude the possibility of independent action" and "to rule out the possibility that the defendants were acting independently."  *Twombly*, 550 U.S. at 554.  Watson points to no evidence here that ties Mohawk's refusals to sell it specific kinds of carpet in 2005, 2006 and 2007 to the conspiracy formed in 1998.

In sum, Watson has not "assert[ed] facts that affirmatively and plausibly suggest" a right to recover under § 1 of the Sherman Act.  *Stalley ex rel. U.S. v. Catholic Health Initiatives*, 509 F.3d 517, 521 (8th Cir. 2007) (citing *Twombly*, 550 U.S. at 557).  Rather, at best, the facts asserted are "merely consistent with" such a right.  *Twombly*, 550 U.S. at 557.  Consequently, the Court finds that the plaintiff has failed to state a plausible claim for relief under the standard established by the Supreme Court in *Twombly*.

IV.	**CONCLUSION**

For the reasons set forth above, Mohawk's Motion to Dismiss (Doc. No. 14) will be granted.  An appropriate Order will enter.


Thomas A. Wiseman, Jr.
Senior U.S. District Judge